

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EMR:SSA/KPO
FR:BM                                                              *610 Federal Plaza*
F. #2021R01087                                                     *Central Islip, New York 11722*

April 24, 2025

By ECF

The Honorable Joanna Seybert
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. Faustin Nsabumukunzi
              Criminal Docket No. 25-138 (JS) (LGD)

Dear Judge Seybert,

      The government respectfully submits this letter in support of its application for a permanent order of detention for the defendant Faustin Nsabumukunzi. The defendant is expected to be arraigned today. As described below, the defendant participated in the Rwandan Genocide, then denied his participation and lied on immigration documents to obtain status in the United States. For the reasons set forth below, the government respectfully submits that the defendant is both a risk of flight and a danger to the community and that no condition or combination of conditions can reasonably secure his appearance at trial or the safety of the community. Accordingly, the defendant should be detained.

I.   Background

    A.   Summary of the Charges

      The defendant, a Rwandan citizen who currently lives in Bridgehampton, New York, was a perpetrator of the 1994 Rwandan Genocide. He denied his participation in the genocide—lied—on immigration documents when he sought status in the United States, where he has lived for twenty years now. For these crimes, on April 22, 2025, the grand jury returned a three-count Indictment charging him with immigration-related crimes. Count One charges the defendant with visa fraud in violation of Title 18, United States Code, Section 1546. Counts Two and Three charge the defendant with attempted naturalization fraud in violation of Title 18, United States Code, Section 1425. The false statements charged in each count relate to the defendant's misrepresentations of his conduct as a local leader of the Rwandan Genocide in Kibirizi, Rwanda.

B. <u>1994 Rwandan Genocide</u>

In early 1994, Rwanda's population was comprised primarily of two ethnic groups: the Hutus and the Tutsis. In April 1994, after the Rwandan President's plane was shot down and the country fell into turmoil, the Hutus, who were in control of the government, began killing their perceived political opponents, including Tutsis. Over the next 100 days, hundreds of thousands of people—primarily Tutsis and other believed to be assisting them—were murdered, raped and mutilated.

The evidence developed in the government's investigation, which included interviews of witnesses who knew the defendant and observed his conduct during the Rwandan Genocide, shows that the defendant was a local leader[1] who used the power and influence of his position as "Sector Councilor" to oversee violence and killings of Tutsis in his Kibirizi Sector.[2] Specifically, at the beginning of the Rwandan Genocide, the defendant allegedly attended public meetings in which he falsely assured Tutsis that they would be protected. The defendant then participated in private meetings for Hutus only, where he urged them to begin killing Tutsis. The defendant helped to set up roadblocks to detain and kill Tutsis when they left their homes.

In addition to acting in a leadership role, according to witnesses, the defendant explicitly directed groups of armed Hutus to kill Tutsis and participated in this violence himself. For example, on or about April 21, 1994, the defendant allegedly directed a group of armed Hutu men to kill a group of Tutsis who were gathered on the grounds of the administrative office where the defendant worked. During this attack, the defendant participated in the violence, including by hitting Tutsis in the head with a club. Following the attack, the defendant directed the armed Hutu men to remove dead Tutsi bodies from the administrative office grounds after they were killed, referring to the dead bodies as "trash" or "garbage." On another occasion, the defendant ordered a group of armed Hutus to go to a location where Tutsis were sheltering and kill them, which the armed Hutus did. Additionally, witnesses alleged that the defendant, as a leader, encouraged Hutu men to rape Tutsi women as a genocidal tool.

C. <u>Defendant's Misrepresentations to U.S. Immigration Officials</u>

The defendant repeatedly denied his role in the Rwandan Genocide on official documents submitted under penalty of perjury to U.S. immigration officials in order to receive immigration benefits. In 2003, he applied for refugee resettlement in the United States. As part of his application process, he was interviewed by an immigration officer, and he did not disclose any involvement in the Rwandan Genocide, nor did he state that he had been a Sector Councilor. This application was granted, and the defendant entered the country for the first time in 2004. In 2006, after entering the United States as a refugee, the defendant filed an Application to Register

---

[1] Witnesses also described the defendant working as a beekeeper, a vocation he carried with him to the United States.

[2] The Sector Councilor was a local government official responsible for administration in the locality of Kibirizi Sector, a sub-region of the Nyaruhengeri Commune, which was overseen by a mayor.

Permanent Residency or Adjust Status (Form I-485) with United States Citizenship and Immigration Services ("USCIS"). On the Form I-485, the defendant explicitly denied ever engaging in genocide and denied ever committing a crime of moral turpitude for which he was not arrested, statements that he knew were false. The Form I-485 was approved by USCIS on or about November 14, 2007, and the defendant was issued a Permanent Resident Card ("Green Card"). The defendant used his Green Card in May 20, 2023, when traveling from Lome, Togo back to Newark, New Jersey.

Next, on or about June 21, 2016, the defendant applied to become a United States citizen. On the relevant USCIS Form N-400, which he signed under penalty of perjury, the defendant denied ever persecuting anyone because of race, religion, national origin, or membership in a particular social group; denied ever committing a crime for which he was not arrested; denied being part of any group that ever used a weapon against another person; denied ever providing weapons to another person; denied participating in any self-defense group, vigilante group, militia group, or paramilitary group; denied ever being "involved in any way" with genocide, or with killing, hurting, or forcing another person to have sexual contact; and denied ever providing false information to a U.S. government official or lying to gain admission or an immigration benefit. The defendant knew these statements were false. The defendant's application is currently pending; accordingly, he is still a lawful permanent resident, but not a naturalized United States citizen.

When advised of the charges against him during his arrest earlier this morning, the defendant responded, "I know I'm finished."

### D. The Defendant's Criminal History

For his perpetration of the Rwandan Genocide, in 2008, the defendant was tried and convicted in absentia in a community-based Rwandan court and given a life sentence. In 2014, the Public Prosecutor of Rwanda indicted the defendant for crimes related to the genocide, and in 2016, Interpol Rwanda issued a Wanted Person Diffusion Notice against the defendant for the crime of Genocide.

## II. Legal Standard and Argument

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). If the court finds by a preponderance of the evidence that the defendant presents a flight risk and that no conditions will reasonably assure the defendant's continued presence, the court should order detention. United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Similarly, a defendant should be detained if the court finds that release on bail would pose a danger to the community, 18 U.S.C. § 3142(e), though detention based on dangerousness must "be supported by clear and convincing evidence," 18 U.S.C. § 3142(f).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis:

>   (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm . . .";
>   (2) "the weight of the evidence against the person";
>   (3) "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and
>   (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

The factors identified in the Bail Reform Act make clear that the defendant poses a risk of flight and a danger to the community.

A. Nature and Circumstances of the Offense

The nature and circumstances of the offense weigh in favor of detention. The defendant is charged with federal crimes each carrying maximum sentences of 10 years in prison. Under the United States Sentencing Guidelines, because the defendant committed visa fraud that concealed his participation in genocide and human rights offenses, he faces a guidelines sentence of 57 to 71 months on these charges. See U.S.S.G. § 2L2.2(4).

Perhaps equally importantly, upon the completion of this case, the defendant faces possible removal from the United States to Rwanda, where he will have to answer for his crimes and potentially face a substantial prison sentence of up to life imprisonment.[3] This creates a powerful incentive for the defendant to flee. See United States v. Munyenyezi, No. 10-CR-085, 2010 WL 2607161, at *2 (D.N.H. June 25, 2010) ("The government has represented that the penalty for a conviction in Rwanda for such acts is life in prison. Thus, the serious potential repercussions for the defendant if convicted here provide a realistic motive for the defendant to flee to avoid those potential repercussions") (holding that the government met its burden of establishing by a preponderance of the evidence that the defendant presented a flight risk and by clear and convincing evidence that the defendant presented a danger to the community); see also United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987) (possibility of a severe sentence is an important factor in assessing a defendant's likelihood of flight); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee).

---

[3] For example, genocide perpetrator Beatrice Munyenyezi was convicted of immigration fraud in a U.S. court and sentenced to ten years imprisonment. In 2024, after completing her U.S. sentence, Munyenyezi was tried and convicted of murder as a genocide crime and other offenses in Rwanda, where she received a life sentence.

Moreover, the charges involve the defendant's alleged decades-long fraudulent attempt to deceive immigration officials about his past. Such charges cast doubt upon the defendant's trustworthiness regarding his promises to return to court for trial. See, e.g., United States v. Nshimiye, No. 24-10071, 2024 U.S. Dist. LEXIS 108918, at *9 (D. Mass. June 20, 2024); 2024 WL 3070253 at *3 ("if the government's allegations are true, defendant has also engaged in a scheme to mislead authorities and avoid facing consequences for his acts during the Rwandan genocide over decades. That pattern would suggest a willingness to evade and escape that is highly relevant to the principal question at issue—that is, his risk of flight were he to be released.").

Given the penalties he is facing, his status as a fugitive for decades, and the repeated false claims he is alleged to have made, there are no conditions that would guarantee his appearance at a trial.[4] Accordingly, this factor favors detention.

B. Weight of the Evidence

The evidence of the defendant's guilt is strong, providing "a considerable incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased"). First, the defendant's own statements in his immigration filings confirm that he was present in Rwanda during the genocide and that he is the person that the witnesses describe. For example, in his I-485 application for permanent residency, the defendant stated, under penalty of perjury, that he was born in Rwanda; he identified his wife and children by name; and he described his occupation as "bee keeper." These facts are consistent with witness statements. Moreover, in his refugee application, he claimed to have fled Rwanda after the genocide.

Second, as described above, numerous eyewitnesses who observed the defendant's conduct in Rwanda in 1994 described him as one of the leaders of the genocide in Kibirizi. Many of these witnesses, who were both Hutu and Tutsi, knew the defendant before the genocide and lived with him as neighbors and friends. The defendant's false statements denying his participation in the genocide are well-documented in his I-485 and N-400 forms. Thus, there is strong evidence in this case, which supports detention. Cf. Nshimiye, 2024 U.S. Dist. LEXIS 108918, at *9

---

[4] Location monitoring is not a good option to mitigate risk of flight as defendants have previously removed their monitors and absconded. See e.g., United States v. Svetlana Dali, 24-MJ-645 (JAM) (defendant cut her location monitoring device while on pretrial release and absconded to Canada, where she was apprehended at the border); United States v. Horst Jicha, 23-CR-342 (OEM) (defendant cut his location monitoring device while on pretrial release and absconded the day before he was supposed to appear for a status conference and remains at large); United States v. Tony Clanton, 23-CR-328 (KAM) (defendant cut his location monitoring device on the eve of trial); United States v. Georges Barker, 23-MJ-27 (SIL) (defendant in an extradition proceeding tampered with his location monitoring bracelet on two occasions before he was remanded); United States v. Marius Lacatis, 22-CR-190 (BMC) (defendant, a Romanian national involved in a fraud conspiracy, was released on bond following his arrest in California and ordered to report to the Eastern District of New York; instead, he cut his location monitoring device, fled and remains at large).

5

(finding that "the statements of four eyewitnesses to defendant's alleged conduct in Rwanda, together with multiple documented statements to officials denying any such conduct, is sufficient evidence to favor detention").

    C. History and Characteristics of the Defendant

The defendant's history and characteristics support detention. As noted above, the defendant is a citizen of Rwanda; his application to naturalize in the U.S. remains pending. See, e.g., United States v. Blanco, 570 F. App'x 76, 77 (2d Cir. 2014) (fact that defendant was not a citizen of the United States was one of several factors demonstrating risk of flight). Moreover, the defendant lived in a third country, Cote D'Ivoire, prior to coming to the United States. Significantly, perhaps knowing the severity of the potential sentence he faced in Rwanda, the defendant previously fled accountability in Rwanda and lived in Cote D'Ivoire for nearly ten years before obtaining asylum in the United States.

Since immigrating to the United States, the defendant has frequently traveled internationally. For example, in his 2016 N-400 application, the defendant identified extensive foreign travel, including lengthy trips back to Cote D'Ivoire, to France, and to Madagascar. Most recently, in March 2025, the defendant returned from Lome, Togo, after spending three months there. And in each of the preceding years—2023, 2022, and 2021—the defendant traveled to Lome and stayed for three months, approximately each December to March. Further, in May 2023, the defendant filed an I-131 Application for Travel Document, requesting that USCIS provide authorization to travel to South Africa and Madagascar; according to the defendant, the purpose of the proposed trip was to look for relatives who might still be alive after the Rwandan genocide. He has also traveled to South Africa, Madagascar, and Paris in the last ten years.

The fact that the defendant has lived and traveled abroad and likely maintains connections outside the United States favors detention. See, e.g., United States v. Choudhry, 941 F. Supp. 2d 347, 357 (E.D.N.Y. 2013) (defendant's foreign citizenship, family ties to other countries, and visits to those jurisdictions suggested "a significant risk of flight") (citation omitted); United States v. Sabhnani, 493 F.3d 63, 76-77 (2d Cir. 2007) (because naturalized United States citizen defendants had "maintained strong family ties to their native countries as well as personal and professional ties" to other countries, "flight would impose no insurmountable personal or professional hardship on defendants").

There is also reason to question the defendant's family ties and employment. 18 U.S.C. § 3142(g)(3)(A). While the defendant immigrated to the United States with his wife and children, he told USCIS in 2015 that, while he continued to live at the same location with his wife, they were no longer together. In his 2016, N-400 application he identified himself as "Single, never married, a statement inconsistent with his prior assertions. There is also reason to believe the defendant presently is unemployed.

III.   The Defendant is a Significant Risk of Flight and a Danger to the Community

Because the defendant faces severe consequences should he be convicted and deported, the evidence against him is strong, and he frequently travels internationally and likely has contacts in foreign countries, he is a significant risk of flight.

Courts have found that defendants who participated in violent genocides and then lied on immigration documents should be detained, as they pose both a risk of flight and a danger to the community. See Nshimiye, 2024 U.S. Dist. LEXIS 108918, at *1 (detaining Nshimiye on the basis that he was a flight risk, particularly with regard to the nature and circumstances of the offense (immigration fraud related to the Rwandan Genocide), the weight of the evidence (four eyewitnesses), and the history and characteristics of the defendant (a willingness to evade and escape accountability)). Moreover, "while the nature of the crime charged, unlawfully procuring naturalization or citizenship, is not itself a violent offense, the factual predicate to establish the government's case (i.e. the defendant was [him]self a genocidist and/or aided and abetted the same) involves heinous conduct that is incomprehensible and unspeakable in its brutality." Munyenyezi, 2010 WL 2607161, at *2 (ordering the defendant detained pending trial).

IV. The Defendant Should Remain Detained

For all of the foregoing reasons, the government respectfully submits that the defendant poses a risk of flight and a danger to the community and should be held without bail pending trial.

Respectfully submitted,

JOHN J. DURHAM
United States Attorney

By: /s/
Samantha Alessi
Katherine Onyshko
Assistant U.S. Attorneys

MATTHEW R. GALEOTTI
Head of the Criminal Division
U.S. Department of Justice

By: /s/
Brian Morgan
Trial Attorney

cc: Clerk of Court (JS) (by ECF)
Evan Sugar, Esq. (by ECF and Email)